**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| MICHELE DIAZ,<br><br>    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>    Defendant. | CASE NO. 1:21-CV-01972-AMK<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br><u>**MEMORANDUM OPINION AND ORDER**</u> |

Plaintiff Michele Diaz ("Plaintiff" or "Ms. Diaz") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 15.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On May 24, 2012, an Administrative Law Judge ("ALJ") issued a decision finding Ms. Diaz had not been under a disability within the meaning of the Social Security Act from January 1, 2009 through the date of the decision. (Tr. 68-80 ("2012 ALJ Decision").) The 2012 ALJ Decision is administratively final and is not challenged herein. (Tr. 711.)

On August 14, 2013, Ms. Diaz protectively filed new applications for DIB and SSI, alleging a disability onset date of January 1, 2009. (Tr. 92, 104.) She alleged disability due to

1

back problems and mental illness.  (*Id.*)  Ms. Diaz's applications were denied at the initial level

(Tr. 102, 114) and upon reconsideration (Tr. 131, 146), and she requested a hearing (Tr. 190).

On September 2, 2015, a hearing was held before an ALJ.  (Tr. 25-63.)

On October 23, 2015, the ALJ issued a decision finding Ms. Diaz had not been under a

disability within the meaning of the Social Security Act from May 25, 2012, the first date of the

unadjudicated period, through the date of the decision.  (Tr. 12-20.)  On January 10, 2017, the

Appeals Council denied Ms. Diaz's request for review.  (Tr. 1-3.)  Ms. Diaz appealed to the U.S.

District Court, and the case was remanded pursuant to a joint motion to remand on October 11,

2017.  (Tr. 849.)  After another hearing, the ALJ issued an unfavorable decision on December

11, 2018, finding Ms. Diaz not disabled.  (Tr. 786-830, 911-27.) On January 17, 2020, the

Appeals Council remanded the case for additional proceedings before a new ALJ.  (Tr. 939-41.)

On June 3, 2020, a hearing was held before a new ALJ.  (Tr. 748-84.)  The ALJ issued a

partially favorable decision on August 26, 2020, finding Ms. Diaz disabled as of June 19, 2020,

but not disabled prior to that date.  (Tr. 709-35.)  The Appeals Council denied Ms. Diaz's request

for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 653-57.)

On March 3, 2021, Ms. Diaz filed a Complaint challenging the Commissioner's final

decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 14, 16.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Diaz was born in 1970 and was 38 years old at the alleged onset date, 42 years old

when the 2012 ALJ Decision was issued, and 49 years old on her established disability onset

date, making her a younger individual under Social Security regulations during the alleged

disability period before this Court.  (Tr. 80, 92, 734.)  She has at least a high school education and past relevant work as a hand packager, cleaner, and home health aide.  (Tr. 732-33.)

**B.    Medical Evidence**

**1.    Physical Treatment History**

Between May 2013 and March 2020, Ms. Diaz attended pain management appointments with providers at Cleveland Back and Pain Management ("CBPM"), including: Deborah Torres, PA-C; Dawn Boyle, CNP; G. Elaine Tryon, CNP; Linda Albertino, CNP; Cindy Thiem; Danielle Germany, CNS; Roberta Woodman, NP; Myra Gold, PA-C; Wendy Turk, CNP; Alecia Parks, NP; and Maria Shedlock.  (Tr. 331-50, 403-27, 529-78, 1245-1320, 1636-98, 1700-15, 1824-1909, 1911-77, 1979-91.)  John H. Nickels, MD, signed off on her encounter notes from May through September 2013.  (Tr. 335, 339, 342, 346, 350.)

At a pain management visit with PA Torres on June 20, 2013, Ms. Diaz complained of low back pain, bilateral hip pain, and tingling in her toes. (Tr. 342-46.)  She appeared healthy but exhibited a limp and antalgic gait.  (Tr. 344.)  On examination, she was tender in the lower lumbar spine, sciatic notch, and sacroiliac joint and had a decreased range of motion to the left, but her strength was 5/5 throughout.  (Tr. 344-45.)  She had a positive straight leg test bilaterally, both supine and sitting.  (Tr. 345.)  Her diagnoses included degeneration of the cervical intervertebral disc, cervical radiculopathy, and lumbosacral radiculopathy.  (*Id.*)  She was instructed to continue with physical therapy at home, her Restoril was increased for better sleep, and her Lortab dosing was decreased.  (Tr. 346.)

At a pain management visit with PA Torres on September 12, 2013, Ms. Diaz reported worsening low back pain with numbness and swelling in her feet and ankles from gabapentin. (Tr. 332-33.)  She reported reduced pain with rest, medications, TENS unit, and heat.  (Tr. 333.)

She exhibited an antalgic gait, favoring her right leg.  (Tr. 334.)  Her diagnoses remained the same.  (Tr. 334.)  Neurontin was discontinued due to sensitivity; Ultram was continued for pain and Doxepin for sleep; Lortab and Restoril were held based on Ms. Diaz' probation.  (Tr. 345.)

On October 23, 2013, Ms. Diaz underwent an MRI of the lumbar spine.  (Tr. 442-43.) The MRI revealed disc herniation at L3-4, L4-5, and at L5-S1.  (Tr. 443.)

On November 8, 2013, Ms. Diaz met with rheumatologist Isam Diab, M.D., F.A.C.R. (Tr. 395.)  Dr. Diab noted moderate synovitis and tenderness with decreased range of motion in her first, second, and third metacarpophalangeal joints, and the second and third proximal interphalangeal joints, right greater than left, and modest synovitis of the bilateral wrists, right greater than left.  (*Id.*)  Testing revealed a weakly positive ANA result and rheumatoid factor of 17.  (*Id.*)  Dr. Diab indicated Ms. Diaz's symptoms were consistent with modestly active inflammatory polyarthritis, rheumatoid variant.  (*Id.*)  He recommended Ms. Diaz continue with exercise and the medications prescribed by Dr. Nickels.  (*Id.*)  He also started Ms. Diaz on Plaquenil 200 mg and Neprosyn 500 mg, and administered a Kenalog injection of 80 mg.  (Tr. 395.)  He advised Ms. Diaz to attend a follow-up appointment on December 27, 2013.  (Tr. 441.)

On January 22, 2015, an x-ray of the cervical spine revealed degenerative joint disease changes at C5/C6 level, with decreased range of motion on flexion and extension.  (Tr. 648.)

At pain management visits with PA Torres and CNP Boyle on February 10, March 16, April 22, and June 3, 2015, Ms. Diaz was tender to palpation of the lumbar and cervical spine, had decreased range of motion and positive straight leg raise testing, and had decreased strength and range of motion of the cervical spine.  (Tr. 532-53.)  She was instructed to continue with her mediations as prescribed.  (Tr. 537, 542, 547, 557.)

On June 24, 2015, Ms. Diaz underwent an MRI of her lumbar spine.  (Tr. 645.)  MRI results indicated disc herniation at L3-4, L4-5 (unchanged from October 23, 2013), and at L5-S1.  (Tr. 645-46.)  On August 6, 2015, Ms. Diaz underwent an MRI of her cervical spine.  (Tr. 641.)  The MRI results indicated disc herniation at C4-5, C5-6, and C6-7.  (Tr. 641-42.)

Ms. Diaz attended a pain management visit with CNP Alberino on August 24, 2015, where she complained of increased neck, lower back, and foot pain.  (Tr. 1245.)  She appeared to be fatigued, in pain, and restless.  (Tr. 1248.)  On examination, she demonstrated an antalgic gait, tenderness and limited range of motion in the lumbar spine, positive compression test and straight leg raise bilaterally, tenderness and pain with range of motion in the cervical spine, and reduced 4/5 strength on cervical extension, flexion, rotation, and lateral flexion, but otherwise normal strength, coordination, sensation, and reflexes.  (*Id.*)  Her diagnoses included degeneration of the cervical intervertebral disc, disorder of trunk (thoracic or lumbosacral neuritis or radiculitis, unspecified), and brachial neuritis, with long-term drug therapy.  (Tr. 1249.)  Her medications were continued, including a Lidoderm patch, Norco, and Robaxin.  (*Id.*)  CNP Alberino recommended a neurological consult and a cervical epidural steroid injection (CESI) and instructed Ms. Diaz to return in six weeks.  (*Id.*)  Blood work from the next day reflected a rheumatoid factor ("RF") of 21 and increased sedimentation rate.  (Tr. 1389.)

At a pain management visit with PA Torres on November 18, 2015, Ms. Diaz complained of pain and limited range of motion after a fall down her patio steps six weeks before.  (Tr. 1254-56.)  On examination, she had an antalgic gait, lumbar and cervical tenderness with limited range of motion, diminished reflexes and sensation in her extremities, and positive straight leg testing.  (Tr. 1256-57.)  Her medications were continued and she was to return in six weeks.  (Tr. 1258.)

At a pain management visit with Ms. Thiem on March 23, 2016, Ms. Diaz complained of pain in her neck, hands, feet, and lower back. (Tr. 1270.) She appeared uncomfortable and fatigued. (Tr. 1272.) Her examination findings were like her August 2015 visit. (*Compare* Tr. 1248 *with* Tr. 1273.) Her medications were continued with a follow-up in six weeks. (Tr. 1274.)

Ms. Diaz' complaints were the same at a June 15, 2016 pain management visit, but her physical examination findings were improved. (Tr. 1281-84.) She showed paraspinal tenderness on the left, and decreased sensation of the knee and medial leg, but with normal gait, strength, and reflexes, and no abnormal findings for the cervical spine. (Tr. 1284.) Her medications were continued, but Norco was increased due to increased pain, Temazepam was added for sleep, and a new TENS unit was ordered because her old TENS unit was no longer working. (Tr. 1285.)

At a pain management visit on August 18, 2017, Ms. Diaz demonstrated tenderness of the lumbar spinous process and paraspinal, pain with motion, diminished reflexes of the knees and ankles, and decreased sensation of the knee and medial leg; other physical examination findings were normal. (Tr. 1472-75.) She was noted to be doing well on her pain medication regimen and instructed to continue her daily range of motion exercises as instructed. (Tr. 1477.)

On August 22, 2017, Ms. Diaz visited rheumatologist Brian Mandell, M.D., Ph.D. (Tr. 1416.) Ms. Diaz reported pain for the past six years, that she had no desire to exercise, and that she sometimes stayed in her room for days. (*Id.*) Dr. Mandell's impression was fibromyalgia, chronic narcotic prescribed use, depression, and sleep disturbance. (*Id.*) Dr. Mandell reduced temazepam to 7.5 mg nightly, and prescribed cyclobenzaprine 5 mg to promote deep sleep and reduce muscle pain; he recommended tapering off of Norco. (Tr. 1416-17.) He also recommended discussing a new antidepressant with her family doctor, and introducing physical activity in the form of at least a five minute walk daily. (Tr. 1416.)

At an October 13, 2017 pain management visit, Ms. Diaz' examination findings showed tenderness in the lower back, diminished ankle and knee reflexes, and decreased sensation of the knee and medial leg, but otherwise normal findings.  (Tr. 1484-87.)  CNS Germany continued Norco and gabapentin for pain control, increased Silenor at night, noted her pain was stable on medications, and instructed her to return in four weeks.  (Tr. 1488.)

On October 18, 2017, Ms. Diaz met with rheumatologist Bassam Alhaddad, M.D.  (Tr. 1460-63.)  On examination, Ms. Diaz had normal range of motion, no tenderness, and her straight leg raise test was unremarkable; she exhibited no synovitis in her wrists or hands.  (Tr. 1462-63.)  Dr. Alhaddad discussed a possible benefit of sulfasalazine to control inflammatory arthritis and recommended regular exercise and to follow up with gastroenterology to monitor her hepatitis C.  (Tr. 1460.)  He also advised Ms. Diaz to discuss increasing her gabapentin dose with pain management.  (*Id.*)

Ms. Diaz returned to pain management on November 10 and December 8, 2017.  (Tr. 1490-1501.)  On examination, she continued to demonstrate lumbar tenderness and pain with range of motion, diminished ankle and knee reflexes, and decreased sensation to the knee and medial leg, with otherwise normal findings.  (Tr. 1493-94, 1499-1500.)  At the December visit, she also had some cervical tenderness. (Tr. 1499-1500.)  Her medications were continued and she was instructed to return every four weeks.  (Tr. 1495, 1500-01.)  In December, a prednisone taper was also prescribed for a flare up of neck pain.  (Tr. 1500.)

On January 5, 2018, Ms. Diaz followed up with pain management.  (Tr. 1575.)  Her examination showed cervical and lumbar tenderness, pain with lumbar range of motion, and lower cervical trigger point pain.  (Tr. 1578.)  She reported improvement with pain following her steroid taper, but that her cervical pain was starting to flare again.  (Tr. 1579.)  CNS Germany

found her pain was stable on medications but ordered a cervical x-ray. (*Id.*) A January 19, 2018 x-ray of the cervical spine showed mild degenerative changes and disc disease at C5-C6 without acute fracture or subluxation. (Tr. 1585.)

Ms. Diaz returned to pain management on February 2, 2018. (Tr. 1651.) Her examination findings continued to show lumbar and cervical tenderness with pain elicited by range of motion. (Tr. 1655.) CNS Germany reviewed her cervical spine imagery and found no adjustment of her medication regimen to be warranted. (Tr. 1656.) Ms. Diaz attended additional pain management visits on March 7 and April 4, 2018. (Tr. 1641-51.) Her examination findings were similar and her medications were continued with no change. (Tr. 1644-46, 1649-51.) Ms. Diaz also attended pain management visits in May, June, and July 2018. (Tr. 1715.) Her examination findings continued to note lumbar and cervical tenderness and pain with range of motion. (Tr. 1703, 1709, 1714.) Her medications were continued without change. (Tr. 1705, 1710, 1715.) She complained of right elbow pain at the June and July visits and was advised to use ice, naproxen, and a Lidoderm patch at night. (Tr. 1703, 1709-10.)

At a pain management visit in December 2018, CNS Germany noted pain with range of motion for the right elbow and lumbar spine, pain with rotation of the cervical spine to the right, and pain to palpation of the cervical and lumbar spine and paravertebral muscles. (Tr. 1872-75.) Otherwise, Ms. Diaz demonstrated a normal gait, normal strength and sensation, and no edema. (Tr. 1875.) Her medications were continued. (Tr. 1877.) Other pain management visits in 2019 noted similar findings. (Tr. 1881, 1887, 1895, 1902, 1907, 1920-21, 1927, 1933, 1940, 1955, 1962.) Her medications were continued, except a Medrol dose pack was prescribed in February, gabapentin was increased in July and decreased in August, and Mobic and diclofenac were added in August but Mobic was decreased in September. (Tr. 1883, 1889, 1896, 1903, 1916, 1922,

8

1928, 1934, 1941, 1948, 1957, 1963.)  In February, Ms. Diaz was given a referral to physical therapy.  (Tr. 1889.)

On February 13, 2019, Ms. Diaz underwent an MRI of the lumbar spine.  (Tr. 2038.) Results indicated lower lumbar degenerative change with mild bilateral foraminal impingement at L4-L5, but no significant canal stenosis or focal disc extrusion.  (*Id.*)

On February 21, 2019, Ms. Diaz had an initial evaluation for physical therapy, conducted by William Demis, PT.  (Tr. 1791-95.)  Ms. Diaz reported that her back pain had been worsening over many years, and was severe at the time of the appointment.  (Tr. 1791.)  Ms. Diaz reported she occasionally found relief with heat, lidocaine patches and with pain medication as needed; she also reported that there were no relieving factors if her pain flared up.  (*Id.*)  She exhibited pain to palpation in her cervical and lumbosacral regions bilaterally.  (Tr. 1792.)  PT Demis recommended physical therapy treatment twice per week for eight visits and indicated that her overall rehabilitation potential was good.  (Tr. 1792-93.)  Ms. Diaz did not attend her next physical therapy appointments and was subsequently discharged.  (Tr. 1796-98.)

Ms. Diaz met with neurosurgeon James Anderson, M.D., on September 19, 2019.  (Tr. 1808.)  Dr. Anderson noted significant spondylosis at C4-C5 and C5-C6 with bilateral foraminal stenosis, based on a recent MRI.  (*Id.*)  Dr. Anderson recommended continuing with conservative treatment, including physical therapy, cervical traction, and epidural steroids and radiofrequency ablation.  (*Id.*)  Dr. Anderson stated that he could not recommend surgery based on the current MRI results.  (*Id.*)  If Ms. Diaz did not improve with conservative treatment, then Dr. Anderson indicated he would obtain a new MRI and explore possible surgical options.  (*Id.*)  In a pain management office visit that same day, NP Parks noted that Dr. Anderson had recommended cervical traction and physical therapy before epidural injections or surgery.  (Tr. 1936, 1941.)

9

At an October 9, 2019 physical therapy appointment, Ms. Diaz reported neck pain with radicular symptoms, which she rated 5/10 at best and 9/10 at worst.  (Tr. 2051.)  She reported worsened pain with sweeping, mopping, turning to the left side, looking down, and lifting anything over five or ten pounds.  (*Id.*)  Ms. Diaz reported decreased functional abilities, including difficulty getting dressed, doing housework, or driving.  (*Id.*)  Ms. Diaz was advised to attend physical therapy one to two times per week for five weeks.  (Tr. 2055.)  Her rehabilitation potential was good, with compliance.  (*Id.*)

Ms. Diaz attended a physical therapy session on October 25, 2019 and reported compliance with her home exercise program.  (Tr. 2007.)  She demonstrated good tolerance and participation at physical therapy, and reported decreased symptoms immediately post interventions.  (Tr. 2008.)  However, Ms. Diaz did not attend her physical therapy sessions scheduled for November 8 and November 15, 2019.  (Tr. 2011-12.)

At a January 19, 2020 pain management visit, Ms. Diaz admitted to painful and limited range of motion of her cervical spine with difficulty moving to the left. (Tr. 1964, 1968.)  She reported that she had quit physical therapy due to anxiety, but that her medications continued to help with pain control.  (Tr. 1967.)  Her pain medications were continued.  (Tr. 1969-70.)  At a pain management appointment on February 13, 2020, her examination noted pain with palpation to the cervical and lumbar spine, cervical range of motion restrictions, some numbness in the bilateral hands, and positive crepitus with bilateral shoulder abduction, but normal gait, strength, and sensation, and full range of motion in the shoulders and lumbar spine. (Tr. 1971, 1975.)  Her medications were continued and she was advised to follow up with Dr. Anderson regarding her complaints of anxiety with physical therapy.  (Tr. 1977.)

2.     **Mental Health Treatment History**

Ms. Diaz underwent a mental health evaluation with Desiree Summers, LPC, on April 5, 2013.  (Tr. 290.)  Ms. Diaz was in moderate distress, crying, tense, and fidgety.  (Tr. 292.)  She otherwise presented with normal behavior, mood, and affect, and had normal attention, concentration, and thought processes.  (*Id.*)  LPC Summers provided Ms. Diaz with connections to resources and recommended coping strategies.  (*Id.*)

At her April 30 and May 14, 2013 appointments with LPC Summers, Ms. Diaz was again restless and tearful.  (Tr. 281, 284.)  LPC Summers identified goals of reducing depressive symptoms and increasing doping strategies to manage emotions; she recommended that Ms. Diaz return in two weeks.  (*Id.*)

On June 17, 2013, Ms. Diaz underwent a psychiatric assessment with Richard Hill, M.D.  (Tr. 308-09.)  Ms. Diaz was tearful and reported symptoms of depression and anxiety, including sometimes isolating in her room for three or four days.  (Tr. 308.)  She also reported distractibility in her daily activities and had difficulty completing an adult ADHD questionnaire administered by Dr. Hill.  (*Id.*)  She reported GI upset and headaches with Wellbutrin, and adverse side effects with Cymbalta; she denied being placed on stimulants or Strattera.  (Tr. 309.)  Dr. Hill diagnosed adult ADHD and started Ms. Diaz on Strattera 40 mg.  (Tr. 310.)

At a July 17, 2013 appointment with Dr. Hill, Ms. Diaz was tearful and complained of feeling disorganized, having racing thoughts, and feeling anxious and fidgety.  (Tr. 304.)  Ms. Diaz said she had been more depressed while on the Strattera.  (*Id.*)  Dr. Hill discontinued Strattera and started her on Ritalin.  (Tr. 305-06.)

Dr. Hill noted at an October 24, 2013 appointment that treatment for Ms. Diaz's ADHD was unsuccessful on Strattera and Wellbutrin.  (Tr. 371.)  Ms. Diaz reported little to no change in

her symptoms despite being on Wellbutrin for two months.  (*Id.*)  On examination, she was pleasant and cooperative, but continued to show "marked difficulty maintaining attention, listening to directions, and even staying still in her chair." (*Id.*)  Nevertheless, her mood was good, she smiled easily, and she did not speak with pressure or increased speed.  (*Id.*)  Dr. Hill continued her on Wellbutrin to see if additional time on that medication would improve her symptoms. (*Id.*)  Ms. Diaz returned to therapy with LPC Summers on October 29, 2013, where she was tense, agitated, fidgety, and tearful.  (Tr. 377.)

At a November 11, 2013 appointment with Dr. Hill, Ms. Diaz' examination findings were similar to her October visit, except she appeared more calm and less pressured.  (Tr. 464-65.) She was continued on Wellbutrin to allow for possible effect with additional time, and because more potentially efficacious treatments had to wait until she was off probation.  (Tr. 465.)  At a follow up visit on February 4, 2014, Ms. Diaz reported that she had overdosed on sleeping pills and cocaine after being given an additional year of probation.  (Tr. 461.)  Her presentation was largely unchanged, with an inability to sit still and trouble making consistent eye contact.  (*Id.*) Dr. Hill noted no improvement with Wellbutrin and decreased her dose.  (*Id.*)

After an eight-month gap in treatment during her incarceration for a probation violation due to use of alcohol and cocaine, Ms. Diaz returned to see Dr. Hill on October 14, 2014.  (Tr. 614.)  She reported that she had not taken her psychiatric medications during her incarceration, and that the counselor at her halfway house suggested she restart treatment and medications. (*Id.*)  On examination, her presentation was largely unchanged; she was still fidgeting, had trouble making eye contact, and easily lost track of conversation.  (*Id.*)  Dr. Hill diagnosed Adult ADHD and depressive disorder, noted that amphetamine and methylphenidate products were contraindicated due to her cocaine relapse, and restarted her on Strattera.  (*Id.*)

Ms. Diaz returned for an office visit with Dr. Hill on December 1, 2014, reporting that she would soon be released from the halfway house.  (Tr. 612.)  On examination, she was much more calm, with less fidgeting in her chair, better eye contact, less pressured speech, better ability to listen, and less preoccupied overall.  (*Id.*)  She was alert and oriented to all spheres, neatly dressed and groomed, with an adequate fund of knowledge, improved attention and concentration, logical and goal directed thought processes, with no tangentiality or circumstantiality, a euthymic mood, normal speech, and intact judgment and insight.  (*Id.*)  Dr. Hill noted that Ms. Diaz' presentation with respect to her ADHD was improved by 50-70%, but increased her does of Strattera due to her reports of little improvement.  (Tr. 613.)

At an office visit with Dr. Hill on January 12, 2015, Ms. Diaz admitted that she noticed far less fidgeting and distractibility.  (Tr. 609-10.)  Her examination findings remained improved, similar to her December 2014 examination.  (*Compare* Tr. 610 *with* Tr. 612.)  Her medications were continued.  (Tr. 610-12.)

Ms. Diaz next returned to see Dr. Hill on March 30, 2015, when she reported she had stopped her medications several weeks before and was drinking again.  (Tr. 607-08.)  She admitted that she noticed quite a difference in fidgeting, preoccupation, and absentmindedness while off Strattera.  (Tr. 608.)  On examination, Dr. Hill noted that Ms. Diaz had a "[f]airly dramatic reversal to original presentation," with fidgeting and constant movements.  (*Id.*)  He continued to diagnose depressive disorder, ADHD, cocaine abuse in remission, and alcohol abuse, and restarted her on Strattera.  (*Id.*)  There are no further treatment records for Dr. Hill.

13

3.    **Opinion Evidence**

i.    **Medical Source Statements**

John H. Nickels, MD

Dr. Nickels completed his first Medical Source Statement on February 24, 2014.  (Tr. 525-26.)  He opined that Ms. Diaz could lift and/or carry ten pounds occasionally and five pounds frequently, supported by findings of lumbar degenerative disc disease and disc herniations.  (Tr. 525.)  He also opined that Ms. Diaz could stand/walk for up to one hour, or twenty minutes without interruption, and could sit for up to two hours, or thirty minutes without interruption.  (*Id.*)  In support, he referenced findings of decreased cervical and lumbar range of motion, positive straight leg testing, muscle spasms, and complaints of pain radiating into her arms and legs.  (*Id.*)  Dr. Nickels also opined that Ms. Diaz could rarely climb, balance, stoop, crouch, kneel, or crawl, could occasionally reach, rarely push/pull, and could frequently manipulate objects, citing the same medical findings.  (Tr. 525-26.)  He opined that she should not work around heights, moving machinery, or in temperature extremes due to instability, would need to elevate her legs at will, and would require one to two additional, unscheduled breaks due to severe pain.  (Tr. 526.)

Dr. Nickels completed his second Medical Source Statement on August 26, 2015.  (Tr. 650-51.)  He again opined that Ms. Diaz could lift and/or carry ten pounds occasionally and five pounds frequently, supported by findings of degeneration of the cervical discs and radicular pain down both arms.  (Tr. 650.)  He opined that Ms. Diaz could stand/walk up to one hour, or twenty minutes without interruption, and could sit up to two hours, or one hour without interruption.  (*Id.*)  In support, he referenced her lumbar disc herniations, decreased cervical and lumbar range of motion, muscle spasm, and positive straight leg raise tests bilaterally.  (*Id.*)  He also opined

14

that Ms. Diaz could rarely climb, stoop, crouch, kneel, and crawl, could occasionally balance, could rarely reach or push/pull, and could frequently manipulate objects, citing the same medical findings.  (Tr. 650-51.)  He also opined that she should not work around heights, moving machinery, or in temperature extremes, due to instability and pain.  (Tr. 651.)  He noted he had prescribed a brace to Ms. Diaz.  (*Id.*)  He also opined that Ms. Diaz required a sit/stand option, the ability to elevate her legs to forty-five degrees, and one hour of additional breaks or rest during the workday. (*Id.*)

Steven Kozmary, MD / Linda Alberino, CNP

Linda Alberino, CNP, completed a Medical Source Statement on August 15, 2018.  (Tr. 1727-28.)  In it, CNP Alberino opined that Ms. Diaz could occasionally lift less than ten pounds, could stand or walk for less than fifteen minutes without interruption, could sit for less than six minutes without interruption, could frequently balance and perform fine or gross manipulation, and could rarely climb, stoop, crouch, kneel, crawl, reach, or push/pull.  (*Id.*)  She indicated that a brace and TENS unit had been prescribed, and opined that Ms. Diaz would need to be able to alternate positions at will, would need to elevate her legs, and would require additional unscheduled breaks.  (Tr. 1728.)  She also opined that Ms. Diaz had moderate to severe pain which interfered with her concentration, would take her off-task, and would cause absenteeism.  (*Id.*)  As to medical findings supporting her opinions, she pointed to Ms. Diaz' reports of pain and a need to reposition herself frequently due to pain, and the risk of future injury.  (Tr. 1727-28.)  On September 13, 2018, Steven Kozmary, M.D., co-signed the opinion.  (Tr. 1731-32.)

Richard Hill, MD

Dr. Hill completed his first mental capacity Medical Source Statement on July 11, 2013.  (Tr. 295-96.)  In it, he checked boxes indicating that Ms. Diaz had the "rare" ability to maintain

attention and concentration, deal with the public, interact with coworkers and supervisors, complete a normal workday without interruption, understand, remember, and carry out complex job instructions, and manage her funds and schedule.  (*Id.*)  He also checked boxes indicating Ms. Diaz could "occasionally" follow work rules, use judgment, maintain regular attendance, function independently, work in coordination with others, deal with work stress, socialize, behave in an emotionally stable manner, react predictably in social situations, and understand, remember and carry out detailed and simple job instructions.  (*Id.*)  Finally, he checked boxes indicating that she could "frequently" respond appropriately to changes in routine settings, understand, remember, and carry out single job instructions, and leave home on her own, and could "constantly" maintain her appearance.  (*Id.*)  Dr. Hill wrote that Ms. Diaz had been seen at his facility since December 13, 2010 for primary care, and had been under his care since June 17, 2013.  (Tr. 296.) He noted that he had seen Ms. Diaz only once, but that she had very strong symptoms of severe adult ADHD.  (*Id.*)

Dr. Hill submitted a second Medical Source Statement on November 8, 2013.  (Tr. 392-93.)  In this statement, Dr. Hill checked boxes opining that Ms. Diaz had a "rare" ability to maintain attention and concentration for extended periods, and an "occasional" ability to maintain regular attendance, deal with work stress, and complete a normal workday without interruption from psychologically-based symptoms.  (Tr. 392.)  Otherwise, he opined that she had a "frequent" or "constant" ability to complete other tasks relevant to mental functioning. (Tr. 392-93.)  In support of his opinions, he wrote that Ms. Diaz had adult ADHD with impairments in attention, focus, and persistence.  (Tr. 393.)  He noted that Ms. Diaz had been under his care since June 17, 2013, approximately five months before.  (*Id.*)

16

On August 3, 2015, approximately two years later, Dr. Hill completed a third Medical Source Statement.  (Tr. 638-39.)  In it, he checked boxes stating Ms. Diaz could "frequently" use judgment, respond appropriately to changes in routine settings, and maintain her appearance, and "occasionally" follow work rules, understand, remember, and carry out simple job instructions, socialize, and leave her home on her own.  (*Id.*)  Otherwise, he opined that Ms. Diaz had a "rare" ability to complete the remaining list of tasks relevant to mental functioning.  (*Id.*)  In support, Dr. Hill wrote that Ms. Diaz had "[d]isabling ADHD symptoms: constant movement, cannot focus, listen (long), eyes darting around room etc."  (Tr. 639.)

Erin Jenks, OTD, OT/L

Ms. Diaz underwent a Physical Capacity Evaluation with Erin Jenks, OTD, OT/L, on April 10, 2020, to assess her tolerance to perform work tasks.  (Tr. 2081-82.)  As to the "[c]onsistency of effort," Dr. Jenks noted that the "results obtained during testing indicate[d] significant observational and evidence based inconsistencies resulting in self-limiting behavior and submaximal effort."  (Tr. 2081.)  As to "[r]eliability of pain," Dr. Jenks indicated the "results obtained during testing indicate pain could have been considered while making functional decisions."  (*Id.*)  Dr. Jenks opined that Ms. Diaz was able to perform at a sedentary level, except that she would need to alternate sitting and standing and would be unable to lift ten pounds, walk occasionally, or sit at least two hours at a time.  (*Id.*)

On May 26, 2020, Dr. Jenks completed a Medical Source Statement.  (Tr. 2084-85.)  She opined that Ms. Diaz could: lift/carry six pounds occasionally and eleven pounds frequently; stand/walk for two hours, or fifteen minutes without interruption; sit for six and a half hours, or fifty minutes without interruption; occasionally perform fine or gross manipulation; rarely climb, balance, stoop, crouch, reach, or push/pull; and never kneel or crawl.  (Tr. 2084-85.)  The only

medical findings Dr. Jenks identified in support of these limitations were increasing shoulder, neck, and low back pain.  (*Id.*)  She also described some of Ms. Diaz' self-reported pain and limitations.  (Tr. 2085.)

### ii.     Consultative Examiner

April Sobieralski, Psy.D., performed a psychological consultative examination on October 5, 2017.  (Tr. 1453-59.)  On examination, Ms. Diaz was noted to be alert, responsive, oriented to all spheres, cooperative and engaged in the conversation, with good hygiene, clear and logical thought processes, eye contact within normal limits, adequate receptive language skills, and no abnormalities of mental content.  (Tr. 1456.)  She did not require questions to be repeated or rephrased, was not confused, and had no difficulties recalling details of her past.  (*Id.*)  She repeated five digits forward and four digits backward, recalled one of three words after a brief delay, calculated two iterations of serial sevens in fifty seconds by counting on her fingers, and attempted three iterations of serial threes with two errors.  (Tr. 1456-57.)  She spelled "world" backward but was unable to calculate most arithmetic problems.  (Tr. 1457.)  Her affect was somewhat flat, but she was observed to laugh and smile at times.  (Tr. 1456.)  She did not present with signs of anxiety, but was observed to bite her nails and described feeling anxious when in a small room.  (*Id.*)  She appeared to have sufficient judgment and adequate insight, and her speech suggested low average to average intelligence.  (Tr. 1457.)

Dr. Sobieralski opined that Ms. Diaz was able to function in the low average to average range of intelligence.  (Tr. 1457.)  However, the remainder of Dr. Sobieralski's "conclusions" and "functional assessment" were limited to summaries of clinical findings on examination and Ms. Diaz' self-reported limitations.  (Tr. 1457-59.)  Dr. Sobieralski noted that Ms. Diaz had

reported no difficulty interacting with others in the work environment, but said she had a bad temper and stayed away from people who she did not get along with.  (Tr. 1458.)

### iii.    State Agency Reviewers

<u>State Agency Medical Consultants</u>

On December 10, 2013, state agency medical consultant, Gary Hinzman, M.D., opined that Ms. Diaz could: lift and/or carry 20 pounds occasionally and ten pounds frequently; sit for six hours in an eight-hour workday; stand and/or walk four hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; never crawl; occasionally crouch, climb ramps or stairs, or stoop; and frequently balance.  (Tr. 98-99.)  Dr. Hinzman indicated the limitations were based on Ms. Diaz's history of degenerative disc disease, and that the RFC was an adoption of the Appeals Council decision of July 7, 2013, pursuant to AR 98-4 (Drummond Ruling).  (Tr. 99.)

On March 12, 2014, the state agency medical consultant at the reconsideration level, Michael Delphia, M.D., opined that Ms. Diaz could: lift and/or carry 20 pounds occasionally and ten pounds frequently; sit for six hours in an eight-hour workday; stand for two hours in an eight-hour workday; walk for four hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; never crawl; occasionally crouch, climb ramps or stairs, stoop, or kneel; and frequently balance.  (Tr. 126-27.)  Dr. Delphia further opined that Ms. Diaz was limited in her ability to reach forward, laterally, or overhead, could not engage in prolonged reaching parallel to the floor, and could frequently handle, finger, and feel.  (Tr. 127-28.)  Dr. Delphia indicated he was adopting the July 17, 2013 RFC pursuant to AR 98-4 (Drummond Ruling).  (Tr. 128.)

On October 16, 2017, state agency medical consultant Gerald Klyop, M.D., adopted a (later vacated) October 23, 2015 ALJ ruling under AR 98-4 (Drummond Ruling).  (Tr. 862).  Dr. Klyop found Ms. Diaz had the capacity to perform "light work except sitting for standing and

walking for four hours in an eight hour day, six hours in an eight hour day, occasionally climbing ramps/stairs, never climbing ladders/ropes/scaffolds, frequent balancing, occasional stooping, kneeling and crouching, never crawling, can perform tasks that do not require prolonged reaching parallel to the floor, can frequently handle, finger and feel, must avoid all exposure to hazards (defined as industrial machinery, unprotected heights, etc.)." (*Id.*)

On March 24, 2018, agency reviewer Leslie Green, M.D., opined that Ms. Diaz: could lift/carry twenty pounds occasionally and ten pounds frequently; could stand/walk four hours in an eight-hour workday; could sit for six hours in an eight-hour workday; could never climb ladders/ropes/scaffolds; could occasionally stoop, kneel, crouch, crawl, or climb ramps/stairs; could frequently balance; must be able to change position at will as long as it would not interfere with her work flow; and must avoid concentrated exposure to extreme cold, vibration, and workplace hazards such as machinery and heights.  (Tr. 897-98.)  Dr. Green did not adopt the prior ALJ's decision because it had been remanded and was awaiting review.  (Tr. 898.)

State Agency Psychological Consultants

On December 5, 2013, agency reviewing psychologist Vicki Warren, Ph.D., opined that Ms. Diaz had moderate limitations in concentration, persistence, or pace and maintaining social functioning, mild restrictions in activities of daily living ("ADLs"), and no episodes of decompensation.  (Tr. 96-97.)  As to functional limitations, Dr. Warren opined that Ms. Diaz could complete a workday and keep up a consistent, but not rapid pace, and that her activities of daily living demonstrated she gave adequate attention for routine tasks.  (Tr. 99-100.)  Dr. Warren did not adopt the ALJ's mental RFC of May 24, 2012 because of a new diagnosis of adult ADHD.  (Tr. 100.)  On March 12, 2014, Paul Tangeman, Ph.D., affirmed Dr. Warren's findings.  (Tr. 125, 128-29.)

On October 17, 2017, state agency reviewing psychologist Tonnie Hoyle, Psy.D., opined that Ms. Diaz was moderately limited in all areas of mental functioning, including: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. (Tr. 859.) As to functional limitations, Dr. Hoyle opined that Ms. Diaz could: understand and recall one- to three-step instructions; persist in concentration for routine tasks; complete routine tasks in a static environment with changes that can be explained; and interact occasionally and superficially, but should not supervise or be required to provide a high level of customer service. (Tr. 862-64.) Dr. Hoyle did not adopt the RFC from the 2015 ALJ decision because Ms. Diaz had different diagnoses and the case was then pending in federal court. (Tr. 864.) State agency reviewing psychologist Irma Johnston, Psy.D., affirmed Dr. Hoyle's assessment on February 1, 2018, adding that Ms. Diaz could persist in routine tasks which are not fast paced. (Tr. 878, 880-882.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the hearing on June 3, 2020, Ms. Diaz testified that she lived with her sister, her brother-in-law, and her nephew. (Tr. 756.) She had her driver's license and sometimes drove. (Tr. 757.) She obtained her GED and had a certificate as a medical assistant. (Tr. 757-58.) Ms. Diaz testified she was prevented from working because of worsening physical and mental status. (Tr. 759.) She described difficulty with burning shoulders and back, tingling hands, "shocks" going up her hands, and numbness in her thighs. (*Id.*) She also reported issues with swelling in her feet, legs, and hands. (Tr. 762.) She sometimes experienced relief with medication, but occasionally needed to "double up" on her medication to obtain relief. (*Id.*) Ms. Diaz took naproxen, gabapentin, Vicodin, lidocaine patches, and hydrocodone for pain. (Tr. 767-68.) She

also used a TENS unit daily, for between six and ten 30-minute sessions, which provided relief. (Tr. 768.)

Ms. Diaz described her disabling mental conditions as depression and anxiety. (Tr. 759-60.) She received treatment for her anxiety and depression, and periodically took medication. (Tr. 760.) She was taking medication for her mental conditions at the time of the hearing. (*Id.*) She stated that her depression also affected her ability to stay compliant with her medications for pain management. (Tr. 766-67.) Ms. Diaz said that she had some friends, but only talked to them over the phone because of her anxiety. (Tr. 764.)

Ms. Diaz said she could lift a gallon of milk, but only by cradling it close to her body and holding it with both hands. (Tr. 769.) She could sit for up to twenty minutes, and stand for ten. (Tr. 770.) She had difficulty driving because it was difficult for her to turn her head to look to the side. (Tr. 771.) She could push a vacuum for up to four minutes. (Tr. 772.) She had to install a bar in her shower and sometimes required help to clean herself. (Tr. 775.) Ms. Diaz also testified to difficulty concentrating. (Tr. 773.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Ms. Diaz's age, education, and work experience, with the function limitations described in the RFC determination could not perform Ms. Diaz' past relevant work, but could perform representative positions in the national economy, including addresser, food and beverage order clerk, and document preparer. (Tr. 780-81.) He also testified that competitive employment would be precluded if a person would either be off task 15% of the work day or absent more than two days per month. (Tr. 782-83.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.     The ALJ's Decision

In his July 14, 2020 decision, the ALJ made the following findings:[2]

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.  (Tr. 713.)

2.    The claimant has not engaged in substantial gainful activity since the alleged onset date.  (*Id.*)

3.    The claimant has the following severe impairments: Degenerative Disc Disease, Rheumatoid Arthritis, Depressive Disorders, Attention Deficit Hyperactivity Disorder (hereinafter "ADHD"), and Personality Disorders.  (*Id.*)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 715.)

5.    The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: lifting 20 lbs. occasionally and 10 lbs. frequently; carrying 20 lbs. occasionally and 10 lbs. frequently; sitting for 6 hours; standing for 2 hours; walking for 4 hours; push/pull as much as can lift/carry; never reach overhead; no more than frequent reaching in all other directions; no more than frequent handling, fingering, and feeling; no more than occasional climbing of ramps and stairs; never climb ladders, ropes, or scaffolds; no more than frequent balancing; no more than occasional stooping, kneeling, or

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

crouching; never crawl; never work at unprotected heights; no dangerous moving machinery and no commercial driving. With regard to understanding, remembering, and carrying out instructions, is able to perform simple, routine tasks with no strict production rate pace requirements; no more than occasional interaction with supervisors, coworkers, and the public; and requires an alternating sit/stand option, which is defined here as: must be able to alternate position for 2 minutes after 30 minutes of sitting or 20 minutes of standing walking, without being off-task**.** (Tr. 718-19.)

6. Since January 1, 2009, the claimant is unable to perform any past relevant work.  (Tr. 732.)

7. Prior to the established disability onset date, the claimant was a younger individual age 18-44. Applying the age categories non-mechanically, and considering the additional adversities in this case, on June 19, 2020, the claimant's age category changed to an individual closely approaching advanced age.  (*Id.*)

8. The claimant has at least a high school education.  (Tr. 733.)

9. Prior to June 19, 2020, transferability of job skills was not material to the determination of disability.  Beginning on June 19, 2020, the claimant has not been able to transfer job skills to other occupations.  (*Id.*)

10. Prior to June 19, 2020, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including call out operator, document preparer, and nut sorter.  (*Id.*)

11. Beginning on June 19, 2020, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform.  (Tr. 734.)

12. The claimant was not disabled prior to June 19, 2020, but became disabled on that date and has continued to be disabled through the date of this decision. Her disability is expected to last twelve months past the onset date.  (*Id.*)

13. The claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2013, the date last insured.  (Tr. 735.)

14. The claimant's Drug and/or Alcohol Abuse (DAA) is not material to the finding of disability.  (*Id.*)

Based on the foregoing, the ALJ made the following determinations. Regarding the application for disability insurance benefits protectively filed on August 14, 2013, Ms. Diaz was not disabled through December 31, 2013, the date last insured. (*Id.*) Regarding the application for supplemental security income protectively filed on August 14, 2013, Ms. Diaz was disabled beginning on June 19, 2020, but was not disabled prior to that date. (*Id.*)

## V.    Plaintiff's Arguments

Ms. Diaz brings two issues for the Court's review:

1.    Whether the ALJ properly evaluated the RFC in light of *Drummond* precedent;

2.    Whether the ALJ accorded appropriate weight to the medical opinions of the treating physicians and the treating psychiatrist.

(ECF Doc. 11, p. 1.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030

26

(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **First Assignment of Error: Whether ALJ Properly Evaluated RFC in Light of** ***Drummond*** **Precedent and 2012 ALJ Decision.**

Ms. Diaz first argues that the ALJ did not properly apply *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), or Acquiescence Ruling 98-04 in light of new evidence and

diagnoses since the 2012 ALJ Decision. (ECF Doc. 11, pp. 13-14.) In support, she points to evidence of worsening in her spinal impairments and new diagnoses of rheumatoid arthritis and adult ADHD. (*Id.* at p. 14.) She argues that the ALJ's stated grounds for imposing fewer restrictions in parts of the RFC were based on incomplete reasoning and failed to build a logical bridge between the evidence the RFC, and that the ALJ also erred by failing "to find substantial new limitations" since 2012. (*Id.* at pp. 14-15.) The Commissioner responds that the ALJ properly considered this application pursuant to the clarified principles set forth in *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018). (ECF Doc. 16, pp. 10-11.)

In *Drummond*, the Sixth Circuit cited to "the principles of res judicata" in holding: "Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." 126 F.3d at 841-42. In a related Acquiescence Ruling, the Social Security Administration ("SSA") applied *Drummond* as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method of arriving at the finding.

AR 98-4(6), 63 Fed. Reg. 29771, 29773 (June 1, 1998).

More recently, in *Earley*, the Sixth Circuit reexamined *Drummond* and its reliance on principles of res judicata, and observed: "Unusual facts, it seems to us, led to some overstatement in *Drummond* but not to an incorrect outcome." 893 F.3d at 933. While *Drummond* was decided based on res judicata principles, the *Earley* court clarified that "res judicata only 'foreclose[s] successive litigation of the very same claim,'" while "'a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.'" *Id.* (citations omitted). Thus, the

28

*Earley* court made it clear that the doctrine of res judicata does not apply when a claimant has filed a new application seeking benefits for a new period of disability.

The court then observed that the inapplicability of res judicata to such cases "helps to explain why *Drummond* referred to 'principles of res judicata' – with an accent on the word 'principles.'"  *Earley*, 893 F.3d at 933 (citing 126 F.3d at 841–43).  The court described the applicable principles as "[f]inality, efficiency, and the consistent treatment of like cases," and explained that an ALJ "honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record."  *Id.* (citations omitted).  Accordingly, the court held: "it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, albeit not binding, consideration in reviewing a second application."  *Id.*  The court refused to hold that an ALJ "should completely ignore earlier findings and applications," explaining that "[f]resh review is not blind review" and "[a] later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making."  *Id.* at 934.

Here, the ALJ acknowledged the "administratively final prior ALJ decision" from 2012 and explained: "to the extent that I deviated from the findings that were made in the 2012 decision, the changes are due to new and material evidence in the updated record."  (Tr. 711.)  He then provided a detailed discussion of the 2012 ALJ Decision and his own reasoning for diverging from the RFC set forth in that decision.  (Tr. 725-26.)  In particular, he observed:

> I adjusted parts of this RFC to account for the different years at issue, and for new and material evidence in the updated record. My RFC finding uses better-defined sit/stand-option and reaching limitations. Additionally, I added to the fine-manipulative limitations to better account for the updated record. This includes, for example, the subjective pain, the updated neck imaging study abnormalities, and the additional treatment and clinical abnormalities for the claimant's upper extremities. However, I reduced the neck-related postural limitations to better account for mitigating factors in the updated record. These include, for example,

> the paucity of long-term physical therapy, the lack of neck surgery, the admissions about driving (even after the date of the neck herniation imaging), and the prevalence of silent/benign neck-related range-of-motion and gross clinical examination signs (See e.g. [Tr. 1429] ("neck motion is preserved"); [Tr. 1543] (including normal alignment and tone, as well as no crepitus or pain with motion);[Tr. 1799]; [Tr. 2032] ("Negative for . . . pain . . ."); [Tr. 2055]. See generally [Tr. 1153-60; 640-48]. I also broadened the claimant's mental limitations to better account for the above-outline[d] additional mental treatment and objective abnormalities in the updated record, including the evidence about ADHD and the further mood-related clinical abnormalities and treatment.

(Tr. 726 (emphasis added).)

Ms. Diaz argues the ALJ's explanation is inadequate because "the ALJ's RFC is, at times *less restrictive* than the prior RFC or predominantly unchanged from the prior ALJ's RFC." (ECF Doc. 11, p. 14.)  With respect to her cervical impairment, she appears to be referring to the ALJ's decision not to include the prior ALJ's limitation to "no frequent head position changes." (*Compare* Tr. 73 *with* 718-19.)  With respect to her new diagnoses of rheumatoid arthritis and ADHD, it is not clear whether Ms. Diaz is challenging other reduced limitations or simply the ALJ's failure to impose additional RFC limitations relating to those impairments.  (*Id.*)

As explained above, the Sixth Circuit clarified in *Earley* that a prior ALJ's findings "are a legitimate, *albeit not binding*, consideration in reviewing a second application," and an ALJ "*may* consider what an earlier judge did if for no other reason than to strive for consistent decision making." 893 F.3d at 933-34 (emphasis added).  The ALJ in this case explicitly considered the RFC findings in the 2012 ALJ decision, acknowledged the new evidence and diagnoses highlighted in Ms. Diaz' brief, and provided a detailed explanation for both his adoption of and his divergence from specific 2012 RFC limitations.  The ALJ's decision thus reflects that he considered the non-binding 2012 ALJ Decision, gave a "fresh look" to the new evidence since that decision, and adopted an RFC that was supported by substantial evidence.

While Ms. Diaz has highlighted certain evidence that could support additional physical or mental limitations, she has not shown that the ALJ's contrary determination lacked the support of substantial evidence.  Because it is not a reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence," *Garner*, 745 F.2d at 387, this Court cannot overturn the ALJ's decision "so long as substantial evidence … supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  The Court finds the first assignment of error to be without merit.

**C.     Second Assignment of Error: Whether ALJ Erred in Analysis of Medical Opinions of Ms. Diaz' Treating Psychiatrist and Treating Pain Management Providers[3]**

Ms. Diaz next argues the ALJ failed to properly analyze the medical opinions of her treating providers, including psychiatrist Dr. Hill and pain management doctors Nickel and Kozmary.  (ECF Doc. 11, pp. 16-24.)   Specifically, she argues the ALJ's consideration of these opinions does not comport with the two-part analysis required by *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-77 (6th Cir. 2013), or the factors to be considered under 20 C.F.R. § 404.1527(d)(2).  (ECF Doc. 11, pp. 16-18.)  She further argues that the ALJ erred in relying on findings from non-examining physicians who had not reviewed evidence submitted after March 2018.  (ECF Doc. 11, p. 16.)

The Commissioner responds that the ALJ followed Social Security regulations when considering the weight given to the treating and non-treating sources.  (ECF Doc. 16, pp. 14-20.)  She argues that rigid compliance with *Gayheart* is not required, and that the ALJ does articulate good reasons for the weight assigned by the ALJ.  (*Id.* at pp. 16, 18.)  As a result, the ALJ's error, if any, was harmless.  (*Id.* at 16.)

---

[3] Ms. Diaz also indicates in her argument heading that she is challenging the weight given to the opinion of the non-treating consultative examiner.  (ECF Doc. 11, p. 16.)  She articulates no argument on this point, however, and the argument is deemed waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Under the governing regulations "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in the case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ gives a treating source's opinion less than controlling weight, she must provide "good reasons" for the weight she assigns. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011). In deciding the weight to be given, the ALJ should consider: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

The "good reasons" provided by the ALJ "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted). However, an ALJ is not required to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.,* 414 F. App'x 802, 804 (6th Cir. 2011); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017) ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both

her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion.") (citing *Francis*, 414 F. App'x at 804-05).

1.      **Whether ALJ Erred in Analysis of Treating Psychiatrist Opinion**

Ms. Diaz argues that the ALJ erred in his analysis of the medical opinions of her treating psychiatrist Dr. Hill, first because he failed to conduct a two-step analysis under *Gayheart* and second because he inappropriately weighed the applicable factors.

As to the first argument, Ms. Diaz is correct that the ALJ did not explicitly discuss whether Dr. Hill's opinion was entitled to "controlling weight" as a treating source opinion, as contemplated in *Gayheart*.  (Tr. 729-30; ECF Doc. 11, p. 18.)  However, the ALJ did acknowledge Dr. Hill "had the advantage of personally and repeatedly examining [Ms. Diaz] over the several-year period that she treated at his facility" and provided "explanations about [Ms. Diaz'] ADHD symptoms and corresponding treatment notes from his practice."  (Tr. 729.) Thus, there is no question that the ALJ considered Dr. Hill's status as a treating provider.

Generally, courts applying the treating physician rule have focused on whether the ALJ considered the appropriate factors and provided "good reasons" for the weight given to the treating source opinion, not whether the ALJ strictly adhered to *Gayheart's* two-step framework. *See Aiello-Zak v. Comm'r of Soc. Sec.*, 47 F. Supp. 3d 550, 558 (N.D. Ohio 2014) ("[R]ecent authority has held that so long as an ALJ adequately addresses the factors required by *Gayheart* and articulates good reasons for discounting the opinion of a treating source, the Commissioner's decision will not be upset by a failure to strictly follow the *Gayheart* template."); *Hawkins v. Comm'r of Soc. Sec.*, No. 5:20-CV-1245, 2021 WL 2227380, at *12 (N.D. Ohio June 2, 2021) ("[C]ourts are increasingly less strict in demanding two clearly separate analyses in cases of treating source opinions, but have been satisfied when the ultimate decision as to weight,

regardless of the precision of its formation, considers the *Gayheart* factors and is supported by good reasons.") (citation omitted); *see also Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 553 (6th Cir. 2020) (applying "good reasons" analysis even where ALJ had found the treating source opinion "was not based on a treating relationship").

Ms. Diaz argues that the ALJ erred in evaluating the weight given to Dr. Hill's opinions because he addressed the factors of supportability and consistency in "only a superficial manner" and failed to give "good reasons" for affording Dr. Hill's opinions "little weight." (ECF Doc. 11, pp. 19-20.) In support of his finding that Dr. Hill's opinions warranted only "little weight," the ALJ offered the following explanation:

> Richard Hill, M.D., Ph.D., provided multiple opinions. His exact suggestions varied, but overall and in his most updated opinion, he suggested that the claimant has catastrophic or worst possible limitations with most work-related mental abilities (See e.g. Exhibit B18F (suggesting that the claimant has no "appreciable" abilities in almost every possible category)). Dr. Hill's opinion is not completely without support. For example, he is a mental health specialist addressing his area of expertise, and he had the advantage of personally and repeatedly examining the claimant over the several-year period that she treated at his facility. Additionally, ALJ Beekman and the above-discussed State agency mental reviewers endorsed limitations in some of the same general categories –e.g., all of these opinions are consistent with an inability to sustain highly complex, highly social, and highly stressful tasks. Dr. Hill also provided support for his assessment, including explanations about the claimant's ADHD symptoms and corresponding treatment notes from his practice.
>
> However, little weight goes to Dr. Hill's assessment. The additional limitations that he suggested are not persuasive. Dr. Hill's opinions are not entirely supported by the treatment records from his facility. For example, rather than showing aggressive modalities commensurate with the catastrophic limitations in his opinions –e.g., psychiatric hospitalization –Dr. Hill's treatment notes generally reflect routine and infrequent outpatient services. His records also include evidence of short term worsening due to gaps in compliance. Furthermore, contemporaneous notes from his facility include benign or unremarkable examination signs in areas like alertness, orientation, mood, affect, behavior, judgement, and thoughts. This is also true of Dr. Hill's own contemporaneous treatment notes, which are overly mixed and not entirely consistent with his full assessment. E.g., near the date that he filled out Exhibit B18F, Dr. Hill described the claimant as normal or unremarkable in areas like alertness, orientation, appearances, fund of knowledge, thoughts, anxiety, speech, and judgement. He also indicated that the claimant's distraction symptoms

were improving with medication. These ambiguities are especially problematic because <u>Dr. Hill provided little in the way of explanation for his opinions</u>. Most of his assessment simply consists of conclusory and unexplained checkboxes. Furthermore, even when he did provide explanation, this was vague, semi-legible, and/or not entirely responsive –e.g., he did not explain how distraction would interfere with stress-tolerance or emotional stability, and he did not cite to commensurate abnormalities elsewhere in the record. <u>Dr. Hill's opinion is also not entirely consistent with the broader record</u>. For example, <u>two State agency mental health specialists provided more up to date assessments that suggest far fewer limitations</u>. Dr. Hill's opinion is also highly inconsistent with the prior ALJ decision. His opinion is also not entirely consistent with the <u>claimant's long-term mental treatment history</u>, including the prevalence of conservative and little-changed outpatient treatment modalities even despite gaps in treatment. <u>The long-term clinical record</u> is also not entirely consistent with all of Dr. Hill's suggestions. This includes, for example, the prevalence of silent/benign clinical examination signs in areas like alertness, attention, concentration, behavior, cooperation, memory, and judgement. <u>This also includes other above-outlined mitigating factors, such as the evidence of driving and shopping, and the evidence of improvement with treatment and sobriety</u>.

(Tr. 729-30 (some internal citations omitted) (emphasis added).)

The ALJ's detailed explanation clearly addressed the appropriate factors, including: (1) the "several-year" length of the treating relationship, with "personal and repeated" examinations by Dr. Hill; (2) the nature of the treating relationship, including "routine and infrequent outpatient services" with no psychiatric hospitalizations and "evidence of short term worsening due to gaps in compliance"; (3) the supportability of the opinion, including the fact that Dr. Hill provided explanations and treatment notes, but his assessments consisted of "conclusory and unexplained checkboxes" with explanations that were "vague, semi-legible, and/or not entirely responsive" and lacked citations to "commensurate abnormalities elsewhere in the record," with contemporaneous notes from Dr. Hill and his facility that contained "mixed" and "unremarkable" clinical observations that were "not entirely consistent with his full assessment"; (4) the consistency of the opinion, in that "two State agency mental health specialists provided more up to date assessments that suggest far fewer limitations" and Ms. Diaz' long term treatment history demonstrated a prevalence of "conservative and little-changed outpatient

35

treatment modalities even despite gaps in treatment" and "silent/benign clinical examination signs"; (5) that Dr. Hill was a "mental health specialist addressing his area of expertise"; and (6) that the record reflected other "mitigating factors, such as the evidence of driving and shopping, and the evidence of improvement with treatment and sobriety."  (Tr. 729-30.)  *See Bowen*, 478 F.3d at 747; 20 C.F.R. § 404.1527(c).

The ALJ's analysis of Dr. Hill's treating opinions comports with the factors described in *Bowen*, 478 F.3d at 747 and 20 C.F.R. § 404.1527(c), and provides the requisite "good reasons" for discounting the opinion.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole*, 661 F.3d at 937.  Thus, the undersigned finds no reversible error with respect to Dr. Hill's opinion.

### 2.    Whether ALJ Erred in Analysis of Treating Physician Opinions

Ms. Diaz also argues that the ALJ erred in his analysis of the medical opinions of her treating pain management providers, Drs. Nickels and Kozmary, because the ALJ failed to perform the first step of the treating physician analysis, collapsed the analysis of two separate physicians, and provided reasons for assigning the opinions "little weight" that did not rise to the level of "good reasons" under the *Gayheart* standard.  (ECF Doc. 11, pp. 20-24.)

As with Dr. Hill's opinion, the ALJ did not explicitly discuss whether these opinions were entitled to "controlling weight," but did acknowledge that these pain management providers "had the advantage of personally and repeatedly treating the claimant over an extended period." (Tr. 730.)  As discussed above, the application of the treating physician rule focuses on whether the ALJ considered the appropriate factors and provided "good reasons" for the weight given to treating opinions, rather than strict compliance with any articulated framework.  *See Aiello-Zak*, 47 F.Supp.3d at 558; *Hawkins*, 2021 WL 2227380 at *12.  Thus, this Court will review the ALJ's analysis of the opinions based on those substantive questions.

36

In criticizing the ALJ's decision to afford "little weight" to these opinions, Ms. Diaz argues it was error for the ALJ to find the opinions were inadequately explained and supported by the treatment records, and further error for the ALJ to give greater weight to "the outdated report of a non-treating, non-examining physician."  (ECF Doc. 11, pp. 21-23.)  The ALJ offered the following explanation in support of his finding that the opinions warranted "little weight":

> John Nickels, M.D., Steven Kozmary, M.D., and Linda Alberino, NP, suggested that the claimant has numerous debilitating physical and off-task-related limitations –i.e., essentially an RFC that would allow for no more than a marginal range of sedentary tasks.
>
> These opinions get little weight.
>
> They are persuasive to the extent that they suggest the need for stand/walk limitations, and some degree of sit/stand option, postural, manipulative, and environmental limitations. For example, these sources had the advantage of personally and repeatedly treating the claimant over an extended period. Additionally, as outlined above, the prior ALJ and the State agency reviewers endorsed limitations in some of the same general categories. However, to the extent that these sources suggested a more restrictive RFC than what I found, that portion of their opinions is unpersuasive. For example, under the applicable rules, a NP is not an acceptable medical source. Additionally, this evidence is inadequately supported. For example, it is internally inconsistent – e.g., Dr. Nickels alternately suggested that the claimant is unable to lift and that the claimant could lift up to 10 pounds. Additionally, the opinions are inadequately explained or backed by citations to corresponding records –e.g., when asserting that the claimant would require off-task and absenteeism limitations, Dr. Nickels did not identify the extent of these limitations or provide an explanation; his opinion simply consisted of conclusory checkboxes. These opinions are also inadequately supported by the corresponding treatment records; contemporaneous and updated records from the facilities of these medical sources include much more benign clinical signs than what the opinions suggest. For example, in contrast with the Dr. Nickels opinions, Dr. Nickels and his staff commonly reported that the claimant had independent ambulation, normal alertness, and normal or mostly normal strength and range of motion signs in the extremities, even during periods in which she was temporarily banned from using recommended painkillers. Additionally, in August 2018, NP Alberino and Dr. Kozmary suggested that the claimant was incapable of lifting 10 pounds or walking 15 minutes at a time. However, only a few weeks earlier, the corresponding treatment notes from their facility indicated that the claimant had normal strength and gait. These ambiguities are especially problematic given the cursory, vague, and checkbox explanations on these opinion forms.

> The broader record is also more consistent with the above RFC finding than it is with the additional limitations suggested in these opinions. This conclusion is supported by overlap with above-outlined mitigating factors, such as the lack of surgery or long-term inpatient care, and the prevalence of silent/benign gait, strength, coordination, dexterity, and range-of-motion-related clinical signs even despite gaps in medication compliance and even despite the paucity of confirmed physical therapy.

(Tr. 730-31 (internal citations omitted) (emphasis added).).

The ALJ thus appropriately addressed the applicable factors as follows: (1 & 2) the ALJ observed that the providers "had the advantage of personally and repeatedly treating the claimant over an extended period"; (3) the supportability of the opinions, including observations that the opinions were "internally inconsistent," "inadequately explained or backed by citations to corresponding records," "inadequately supported by the corresponding treatment records" which demonstrated "more benign clinical signs than what the opinions suggest" and consisted of "cursory, vague, and checkbox explanations"; and (4) the consistency of the opinions, including references to a "broader record" that was "more consistent with the above RFC finding," including "lack of surgery or long-term inpatient care" and the prevalence of "silent/benign" clinical signs "even despite gaps in medication compliance and even despite the paucity of confirmed physical therapy."  (Tr. 730-31.)

Ms. Diaz argues that the ALJ failed to appropriately consider the fact that Drs. Nickel and Kozmary were treating back specialists who oversaw years of treatment amounting to approximately 80 examinations.  (EFC Doc. 11, pp. 21-22.)  However, the Commissioner argues that "there is no evidence [Ms. Diaz] received direct care from either doctor."  (ECF Doc. 16, p. 22 (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007).)  As outlined in Section II.B.1., *supra*, the medical records from CBPM do suggest that Ms. Diaz' pain management treatment visits were with other providers in that practice, not specifically Drs.

Nickels or Kozmary.  The ALJ nevertheless acknowledged that Drs. Nickels and Kozmary were treating providers who "had the advantage of personally and repeatedly treating the claimant over an extended period," specifically discussed clinical signs that "Dr. Nickels and his staff commonly reported," and addressed the "contemporaneous and updated records from the facilities of these medical sources."  (Tr. 730-31.)  The Court finds the ALJ adequately addressed the length, frequency, nature, and extent of the providers' treating relationship with Ms. Diaz.

Ms. Diaz also argues that the ALJ improperly characterized the clinical examination findings, focusing on normal examination findings "to the exclusion of all of the[] consistently abnormal findings."  (ECF Doc. 11, p. 22.)  On the contrary, the ALJ found the abnormal clinical findings in the treatment records supported "the need for stand/walk limitations, and some degree of sit/stand option, postural, manipulative, and environmental limitations."  (Tr. 730.)  He merely concluded that the clinical findings in the corresponding treatment records were "much more benign . . . than what the opinions suggest."  (Tr. 731.)  While the clinical findings highlighted by Ms. Diaz could support additional limitations beyond the RFC, they are insufficient to mandate a finding that the RFC limitations given lacked the support of substantial evidence.

Ms. Diaz also argues that the ALJ erred in affording greater weight to the opinion of state agency reviewing physician Michael Delphia, M.D.  (ECF Doc. 11, pp. 21-22.)  However, the Sixth Circuit instructs that "an ALJ may rely on the opinions of state agency physicians who did not have the opportunity to review later-submitted medical records if there is an indication that the ALJ considered such records before assigning weight to an opinion that is not based on the full record."  *Stevenson v. Kijakazi*, No. 5:20CV2688, 2022 WL 4551590, *14 (N.D. Ohio Sept. 29, 2022) (citing *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009); *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007))). "There is no categorical requirement that the

non-treating source's opinion be based on a complete or more detailed and comprehensive case record."  *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x. 997, 1002 (6th Cir. 2011) (internal citations and quotations omitted).  Of course, there must be "some indication that the ALJ at least considered" the later medical records.  *Fisk*, 253 F. App'x. at 585; *Blakely*, 581 F.3d at 409 (quoting *Fisk*, 253 Fed. Appx. at 585).

Here, the ALJ gave great weight to Dr. Delphia's opinion but noted that he "added limitations to better account for the full and updated record," including limitations to account for "factors like the imaging-confirmed spine herniation, the subjective pain allegations, the long-term pain management services, and the scattered clinical signs of pain, antalgic gait, weakness, and full range of motion loss."  (Tr. 727.)  Thus, the ALJ appropriately considered and accounted for his reasons in affording greater weight to the non-examining opinion of Dr. Delphia.

For the reasons stated, the Court finds the ALJ's analysis of the opinions of Drs. Nickel and Kozmary included consideration of the relevant factors and provided "good reasons" to support the "little weight" given to those opinions.  Thus the Court finds no reversible error with respect to the opinions of Drs. Nickel and Kozmary.  The Court finds the second assignment of error to be without merit.

**VII.   Conclusion**

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

September 27, 2023

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge